**Shirley Ann FORT, St. Louis Child Support, Plaintiffs-Respondents,**

v.

**Johnnie M. CHESTER, Defendant-Appellant.**

No. 52311.

Missouri Court of Appeals, Eastern District, Division One.

June 9, 1987.

Johnnie M. Chester, pro se.

Gregory R. Wilsey, Asst. Circuit Atty., St. Louis, for plaintiffs-respondents.

KELLY, Judge.

Johnnie M. Chester, putative father, appeals from the judgment of the Circuit Court of St. Louis City declaring him to be the father and responsible for the support of the child of respondent Shirley Fort.

We reverse and remand.

Baby R was born on April 23, 1985. Approximately two weeks after the child's birth, Shirley Fort applied for public assistance, and stated then that Johnnie Chester was baby R's father.

On June 25, 1985, mother signed a petition for declaration of paternity and order of support. Additionally, Fort signed a statement indicating that "Johnnie Chester is the father of baby R [sic] and hereby requests that the court make and enter a child support order based upon the information supplied to the Circuit Attorney's Office, Child Support Unit."

On August 8, 1985, Chester was properly served with the petition and summons, demanding that he file pleadings with the Circuit Court to respond to the paternity petition. Later that afternoon, Johnnie Chester voluntarily met with the Assistant Circuit Attorney to discuss the petition for declaration of paternity and order of support. The Assistant Circuit Attorney advised Chester that he could retain an attorney. We infer from the record that Chester chose not to retain the services of legal counsel, and at that time agreed to submit to a blood test. The legal file includes a signed stipulation of blood tests, whereby Chester agreed that if the results of the test indicated that a probability of paternity exceeded 90%, he would be required to enter into a stipulation for consent judgment declaring him to be baby R's father and requiring him to support said child.

On August 20, 1985, blood samples were drawn from the mother, baby R, and Johnnie Chester. The samples were sent to the Roche Biomedical Laboratories for paternity testing. On November 1, 1985, the results of the blood tests indicated that the alleged father, Johnnie Chester, and baby R shared common genetic markers. Further, the results of the test demonstrated a 91.19 percent probability of paternity. The record indicates that the test results were furnished to both Chester and Fort.

In January, 1986, Chester failed to appear to execute the consent judgment specified in the stipulation, and Chester was given until March 1, 1986, to obtain counsel.

On January 7, 1986, Shirley Fort wrote a letter to David Schafer, an investigator for the Child Support Unit, advising him that she had last received public assistance on November 2, 1985. She explained that she no longer wanted Johnnie Chester to be responsible for the support of baby R, and also requested that the petition for declaration of paternity and order of support be dropped. Allegedly, Chester had agreed to pay her child support without the assistance of the Child Support Enforcement Unit.

On April 30, 1986, Chester filed two pro se motions to strike the blood test stipulation and results because no attorney had been provided to counsel him prior to his signing the stipulation. Chester also filed a copy of a letter written by Dr. William Bowles certifying that Chester should be considered sterile.

Subsequently, another letter was written by Shirley Fort, dated May 2, 1986, to the Honorable Booker T. Shaw, stating that she had made a mistake and that Johnnie Chester is not the father of baby R, and that the real father is Marvin Sullivan.

On June 18, 1986, Chester appeared in court with Shirley Fort. Chester was questioned as to his desire to proceed or reset the hearing so that he could obtain counsel. Chester indicated that he wished to proceed and the case was tried to the court without a jury. Mother's interests were represented at trial by respondent State of Missouri by the assignment of her support rights to the State. The child's mother appeared in the cause individually and as next friend of the child.

At trial, the prosecutor asked Fort the name of baby R's father. The following dialogue took place:

FORT: The baby's father's name is Marvin Sullivan.

PROSECUTOR: Your honor, at this time, we would request that you admonish the witness as to the penalties of perjury and the petition she placed as to her false swearing before a notary.

EXAMINATION BY THE COURT:

COURT: I didn't hear your last answer, Miss Fort. When he asked you who the father was, who did you say that was?

FORT: Marvin Sullivan.

COURT: Now, before this hearing began, you may recall, Miss Fort, that I informed you regarding the possibilities that you may be perjuring yourself, having previously sworn, under oath, that the father was Mr. Chester and now testifying under oath that the father may be someone else. Do you understand that?

FORT: (No audible response.)

COURT: Well, the problem is, actually, an attorney needs to speak with you regarding your testimony here today. Are you absolutely certain, at this time, that Mr. Chester is not the father of the child?

FORT: Yes.

COURT: And what makes you so certain of that today when you were equally positive that he was the father on previous occasions?

FORT: It was just an honest mistake on my part that I told him that he was.

COURT: Well, you've used that phrase several times. That—how could you have made such an honest mistake, or made such a mistake at all?

FORT: Anybody can make a mistake.

COURT: Well, I'm sure everyone makes mistakes, but, how is it that you became confused as to the paternity of this child?

FORT: It just was a mistake that I accused him of being her father, and he wasn't.

COURT: Well, what further information or evidence did you receive to make you believe that Mr. Chester was not the father of the child?

FORT: He's not the father.

Following the hearing, the trial court entered its order declaring Chester to be the father of baby R, and ordered Chester to pay child support.

■ When dealing with the most sensitive issue that can be raised concerning a child—that of paternity—we find it necessary to raise sua sponte the question of proper representation of the child and the presence of the necessary parties. Under the circumstances of this case, we conclude that the interests of baby R would best be served by reversing and remanding the case for appointment of a guardian ad litem and a relitigation of the issue of paternity.

■ We note at the outset that the best interests of the child are of paramount importance. We rely on *J.M.L. v. C.L.*, 536 S.W.2d 944 (Mo.App.1976) in making our

determination that a guardian ad litem in the instant case will best insure proper representation of baby R.

In *J.M.L.*, the alleged father initiated an action to establish the paternity of his minor, in which the alleged father was not the natural mother's husband at the time of the minor's birth. We held that the trial court erred in failing to appoint a guardian ad litem to protect the interests of the child. The court began its analysis of the need to appoint a guardian ad litem in order to protect the interests of the child by analogizing the issue of a child's interest in a paternity proceeding to that of a child's interest in a personal injury suit. "Courts have held that failure to appoint a guardian ad litem for minors in personal injury litigation would be grounds to have an unfavorable judgment set aside. *J.M.L. v. C.L.*, 536 S.W.2d 944[6] (Mo.App.1976), citing *McDaniel v. Lovelace*, 439 S.W.2d 906, 911[9] (Mo.1969). And here the child has much more to lose than money." *J.M.L.*, 536 S.W.2d at 947[6]. The court went on to say that a guardian ad litem is necessary since the litigation purports to make a binding effect on the child's status. The court concluded its analysis with a discussion of the unusual circumstances of the case.

> The trial judge should have been put on notice that the child's interests were not being protected by the mother, as evidenced by her actions. She first denied respondent's paternity in her answer to his petition, then she admitted his paternity in a signed stipulation, and now she again denies his allegation of paternity and then requests that the issue of paternity be litigated on the merits. Thus a guardian ad litem, and in this case, not the child's mother, should have been appointed by the court.
> *J.M.L. v. C.L.*, at 947[6].

In the present case, when the mother originally applied for public assistance she signed a notarized statement indicating that Johnnie Chester was the father of baby R. She subsequently testified under oath that she was absolutely certain that Chester was not the father of baby R.

Analogous to the reasoning in *J.M.L.*, we believe that the trial court should have been put on notice that the child's interests were not being protected by the mother when she vacillated in her sworn statements regarding the paternity of baby R.

The order rendered by the trial court declaring Johnnie Chester to be the father of and responsible for the support of baby R is set aside, and the cause is remanded for the appointment of a guardian ad litem by the court and a relitigation of the issue of paternity.

SATZ, P.J., and CRIST, J., concur.